U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

OCT 05 2005

LAWRENCE K. BAERMAN, CLERK
ALBANY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

Civil Case No.:

COMPLAINT PURSUANT
TO THE AMERICANS
WITH DISABILITIES ACT

Joseph P. McInerney,
*Plaintiff*

**05 -CV- 1267**

DNH / DRH

vs.

Rensselaer Polytechnic Institute; The Mechanical Aeronautical Nuclear Engineering
(MANE) Department of Rensselaer Polytechnic Institute; MANE Department Chairman
John Tichy; MANE Graduate Coordinator Antoinette Maniatty; MANE Professor Leik
Myrabo; MANE Professor Kenneth Jansen.
*Defendants*

---

Plaintiff in the above-captioned action, alleges as follows:

## JURISDICTION

1.
This is a civil action seeking judgement, relief, and/or damages brought pursuant to the
Americans with Disabilities Act, 42 U.S.C §12101 *et seq.*, as amended, for discrimination
based upon a disability and the failure to accommodate the same. This Court has
jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343(4).

## PARTIES

2.      a.      Plaintiff:      Joseph P. McInerney
                Address:        15 Mitchells Avenue
                                Lowell, Massachusetts  01854

FORM E(1)(d).1

3.   a.   Defendant:            Rensselaer Polytechnic Institute
          Official Position:    Private College of Higher Education
          Address:              Troy Building 3rd Floor
                                110 8th Street
                                Troy, NY  12180

     b.   Defendant:            MANE Department
          Official Position:    Department of Rensselaer Polytechnic Institute
          Address:              JEC 2049
                                110 8th Street
                                Troy, NY  12180

     c.   Defendant:            John Tichy
          Official Position:    Professor; MANE Department Chairman
          Address:              JEC 2049
                                110 8th Street
                                Troy, NY  12180

     d.   Defendant:            Antoinette Maniatty
          Official Position:    Professor; MANE Graduate Student Coordinator
          Address:              JEC 2049
                                110 8th Street
                                Troy, NY  12180

     e.   Defendant:            Leik Myrabo
          Official Position:    Professor; Plaintiff's Research Advisor
                                from 9/2001 until 1/2003
          Address:              JEC 2049
                                110 8th Street
                                Troy, NY  12180

     f.   Defendant:            Kenneth Jansen
          Official Position:    Professor; Plaintiff's Research Advisor
                                from 2/2003 until 7/2004
          Address:              JEC 2049
                                110 8th Street
                                Troy, NY  12180

FORM E(1)(d).2

4. My disability is as follows:

In brief, I have brain damage that causes me to have epileptic seizures, and experience dizzy spells, head-rushes, headaches, fatigue, and varying degrees of numbness, tension, and pain in my right leg and right arm and hand all depending on the amount of sleep that I get, the amount of reading, writing, and talking that I try to do, and the amount stress that I am under.

My brain damage was caused by a brain infection and stroke I suffered in August 2000. The brain infection was medically described as a bacterial brain abscess.

The brain infection caused a stroke and permanent brain damage to the areas of my brain that control muscles on the right side of my body.

To cure the brain infection, I was required to undergo brain surgery and six weeks of intravenous penicillin. I was hospitalized from August 22, 2000 until October 6, 2000.

The stroke resulted in temporary paralysis to right side of my body including total paralysis of my right arm, leg, and trunk muscles, and slowing of my speech until I was able to speak only a few words at a time. After my release from five days of post-operative care at Massachusetts General Hospital, I was transferred to New England Rehabilitation Hospital in Woburn, Massachusetts for the next six weeks to finish my penicillin regimen, and slowly regain my ability to walk, talk, and use my right arm and hand.

As after effects of my brain damage, I began experiencing epileptic seizures and I am now required to take anti-seizure medication as well as muscle relaxers to ease the constant tension in my once paralyzed right leg. The side-effects of my medication added to my brain damage result in intermittent bouts of dizziness and difficulties with concentration. Despite these difficulties, I am still extremely intelligent, and a skilled and talented engineer, and I am determined to achieve my Ph.D. in Engineering.

The year 2002 was a particularly difficult year for my health. In January 2002, I had a grand mal epileptic seizure. On March 22, 2002, I left school early and walked to the Samaritan Hospital in Troy to seek treatment for dizzy spells and exhaustion after being refused treatment at Rensselaer's Student Health Center. On May 6, 2002, I had epileptic seizure on the Rensselaer campus while riding my bicycle in front of the Troy building. Students--including my co-workers in Professor Myrabo's Aerolab--witnessed the seizure, and called an ambulance which took me to the Samaritan Hospital for treatment. On June 9, 2002, I suffered another epileptic seizure while on an outing with co-workers from the Professor Myrabo's lab. Finally, on August 6, 2002, I had an epileptic seizure on a train in Massachusetts while traveling back to my job in Professor Myrabo's lab.

FORM E(1)(d).2 extension.

5.

The conduct complained of in this action involves:

     (C) Denial of participation in public service or program.

     (D) Failure to make alterations to accommodate disability.

     (E) Retaliation.

     (F) Other acts specified below:

     Intimidation, by threats to block my efforts to obtain my degree.

     Failure of administrators to take action to prevent discrimination against me.

## FACTS

6.

On the following page, set forth the facts of your case which substantiate your claim of discrimination. List the events in the order in which they happened, naming the defendants involved, dates, and places.

Note: Each fact should be stated in a separate paragraph; paragraphs should be numbered sequentially.

You must include allegations of wrongful conduct as to EACH and EVERY defendant in your complaint.

(1) In the summer of 2001, defendant e., Professor Myrabo paid Ryan Bracken and Mike Libeau to work for him as research assistants with money from a NASA grant.

(2) D. Meloney also worked for Professor Myrabo because Professor Myrabo helped D. Meloney win a Department of Defense Scholarship.

(3) In late August 2001, I enrolled in classes at Rensselaer, and I started working as a teaching assistant for the MANE department.

(4) Also in August 2001, I started to do research for defendant e., Professor Myrabo after he told me he would pay me later in the fall. I took Professor Myrabo's statement that he would pay me later in the fall as the truth.

FORM E(1)(d).3

(5) In the middle October, Professor Myrabo visited me in the lab, and I asked Professor Myrabo when he was going to start paying me as a research assistant. Professor Myrabo said could not pay me for my fall work, but he said that he would start paying me at the beginning of the spring semester.

(6) In December 2001, I learned that Professor Myrabo was not going to pay me as Research Assistant in the spring, and he knew that he did not intend to pay me at either of our late August 2001 or mid-October conversations when he said he would pay me. The string of lies that defendant e., Professor Myrabo laid for me in the fall of 2001 is telling of the defendant Myrabo's character with respect to his propensity to lie.

(7) One week before Christmas 2001, Professor Myrabo, Mike Libeau, and I had a serious meeting in the downstairs wind-tunnel lab of Professor Myrabo's lab. I told Professor Myrabo that I was disappointed that would not be paying me as a Research Assistant in the spring. I asked Professor Myrabo--point blank in front of Mike Libeau--if Professor Myrabo would be able to pay me as a Research Assistant over the summer of 2002. He looked me straight in the eye and said he definitely would be able to pay me as a Research Assistant over the summer of 2002 with another NASA Grant that he was expecting. I made it clear to Professor Myrabo that he would need to pay me over the summer or else I would be forced out of my apartment. I would then need to leave Rensselaer for another college that would pay me.

(8) At that one week before Christmas 2001, meeting Professor Myrabo, Mike Libeau, and I also discussed writing a proposal for a long range grants to various government agencies that would support all of our research.

(9) Over the Christmas 2001 class break, I wrote a draft of a grant proposal that we might be able to submit to the Navy or another Defense oriented government agency. Professor Myrabo said it was very good, but that was the last I ever saw of that proposal.

(10) In mid-April of 2002, Professor Myrabo visited the lab once again. I asked him again to make sure that he was going to be able to pay me over the summer. He hinted that the NASA Grant might be late. I told him that my Teaching Assistant's job would end in the middle of May, and if he could not pay me, I would be forced to leave Rensselaer and find a school that would pay me to do research.

FORM E(1)(d).3 extension 1

(11) At the end of April 2002, Professor Myrabo called me out of the blue and told me within the next half hour I would be getting a call for a phone interview for a temporary job with one of his former students, Don Messitt. The temporary job would be for a company out in California. Professor Myrabo had never talked about sending me to work in California, so his phone call was a shock to me. After my January 12, 2002 seizure and my March 22, 2002 trip to the hospital for exhaustion, I was seriously worried about being healthy enough to make a trip out to California.

(12) I received the call from California within 20 minutes of my call from Professor Myrabo. I was polite to Don Messitt, and told him, though I was not enthusiastic about moving to California, but that I would consider the job.

(13) On May 06, 2002, I had seizure in front of the Troy Building, the next building over from the Ricketts Aerolab, and that was witnessed by the students in Professor Myrabo's lab including Matt Fillipelli.

(14) The two days later, on May 08, 2002 , I called Don Messitt in California to tell him that I would not be taking the job. I stated to Mr. Messitt that I needed a longer range solution to my financial problems than a temporary job 3000 miles away. Don Messitt gave me information about a website for NASA scholarships that might give might give more long term financial security.

(15) After that May 08, 2002 phone call to Don Messitt, Professor Myrabo was mad that I had not taken the job, and "said that I had given him a bloody nose, and embarrassed him in the eyes of the Don Messitt." I think Professor Myrabo was mad that I disobeyed him, and at that point Professor Myrabo set out to retaliate against me, or least keep me impoverished so that he could have more control of me.

FORM E(1)(d).3 extension 2

(16) On May 17 2002, Professor Myrabo took Mike Libeau and me to lunch at a fast food restaurant for a serious talk about the future of our research. Professor Myrabo was not in the habit of taking student to lunch. He brought no cash, and he thought a fast food restaurant would take a personal check. Mike and I ended up paying for Professor Myrabo's lunch. Professor Myrabo reimbursed Mike with a $2 dollar check, and he gave me a $5 dollar check, which I have since framed and now keep as a memento of one of the more comical events of my 12 years in college. Imagine two minimum wage college students buying lunch for a wealthy professor! At the lunch meeting, Professor Myrabo said he be late in getting his summer NASA grant. I told Professor Myrabo that at the end of May 2002, I was going to pack up my apartment and to move back to Massachusetts and not come back. He told me he would call his friends at NASA to see if he could speed up the release of his NASA grant money so that he could start paying me. I told Professor Myrabo that unless he got serious about finding permanent funding for my research I was going to leave. I told him that about the scholarship tip that Don Messitt had given me. I told Professor Myrabo that we needed to fill out the applications for not only that scholarship, but as many other scholarships as might support my research. I also asked him what happened with the Navy proposal that I had given him after Christmas. Professor Myrabo said would help me with all of these scholarships and proposals. Professor Myrabo convinced to stay in New York for another few weeks to see if he could straighten out the delay with the NASA grant.

(17) A few weeks after the May 17, 2002 lunch meeting, Professor Myrabo finally got confirmation of his summer NASA grant. Just to prove it, he sent me to see the MANE department financial administrator, Rose Boshoff, in JEC 2001, who showed me documentation from NASA that said he would be getting the grant starting July 12, 2002. In face of that documentary evidence and Professor Myrabo's agreement to help me win a scholarship that would free me of financial worries until I achieved my Ph.D. degree, I agreed to accept a school pay advance for my June rent. I needed to see that documentary evidence, because words that come out of Professor Myrabo's mouth cannot be trusted.

(18) On June 2, 2002, I submitted the NASA scholarship proposal to Professor Myrabo along with faculty signature sheet which he had to sign, and a request for a letter of recommendation that was required by NASA scholarship committee. The scholarship proposal was the required 5 pages and could be read in less than one hour. A week later I called Professor Myrabo to see if had read it. He said he was busy that week and had not had time to read it. A week later I called Professor Myrabo to see if had read it. He said he was busy that week and had not had time to read it. A week later I called Professor Myrabo to see if had read it. He said he was busy that week and had not had time to read it. This iteration went on all summer.

(19) I felt exhausted from working in Professor Myrabo's lab in the last week of July 2002, and thought that a few days with my family in Massachusetts would refresh my health. On July 30, 2002, I took a bus back to Boston.

(20) On August 1, 2002, after 2 months of dragging his feet, Professor Myrabo placed the June 2, 2002 NASA scholarship draft on my desk. It was edited in pen with all sorts of very minor changes to individual words and phrases that in no way altered its original meaning. I doubt if the editing took him more than 1 hour, never mind 2 months. During those 2 months, I could have made copies of the proposal, and sent it out to a dozen government agencies or independent institutions that support student research. It is this foot dragging that I allege is retaliation for disobeying him or embarrassing him for refusing to take the California job due to my ill health.

(21) I attempted to return to Rensselaer on August 6, 2002, but collapsed and had an epileptic seizure on the train. I was taken off the train by paramedics and transported by ambulance to the Lahey Clinic Hospital in Burlington, Massachusetts for treatment. My father and mother drove to Burlington to take me home in Lowell, MA, where I needed another 20 days to recover enough to travel. It is a good thing I did not take that California job.

(22) I returned to Rensselaer on August 26, 2002, still weak and dizzy and not fully adjusted to a new type of anti-seizure medication that still makes me sleepy.

(23) Professor Myrabo's instructions on the June 2, 2002 proposal draft were to make his suggested changes, and then ask Professor Anderson to review the updated proposal. I made the changes suggested, and I gave the update to Professor Anderson on September 16, 2002. I checked with Professor Anderson at his office every week, but he never had time to read my proposal either. Finally, near the end of October he did read it. I picked up my proposal from Professor Anderson in person at his office. Professor Anderson wrote "very nice Joe" on the cover. Professor Anderson had crossed out only two words on my proposal. Professor Anderson told me my NASA proposal was very well written, and to submit to NASA "as is". He also told me come work for him as soon as I got sick of playing games with Professor Myrabo.

FORM E(1)(d).3 extension 4

(24) In the first week in November 2002, I removed the two words from my proposal that Professor Anderson suggested that I eliminate, and then I told Professor Myrabo I was ready to submit the proposal to NASA. I also told Professor Myrabo that I needed him to sign the proposal signature page and to give me the letter of recommendation that he had by this time over five months to write. He had not done either of these two simple things, and made up more excuses about being busy, and drag out more time.

(25) On November 17, 2002, I had enough of Professor Myrabo's foot dragging on my NASA proposal. I went to defendant c., MANE Department Chairman John Tichy's office and asked to speak with him. First, I asked Professor Tichy's to read my letter of introduction from the Assistant Dean for Disabled Student Services, Debra Hamilton. I told Professor Tichy that I had suffered a stroke two years earlier, and that I have brain damage. I told Professor Tichy of some of the medical problems I had experienced earlier in the year such as the four seizures and the bouts of exhaustion. I then told Professor Tichy about the problems I had been having getting Professor Myrabo to help me with my NASA proposal like signing the signature sheet, and writing me a letter of recommendation. He said he that he did not like to get involved in student/faculty issues. I thought that was part of his job as the department head. It was at other schools that I have attended. He agreed to speak with Professor Myrabo, and put a little pressure on him to fill out the signature sheet and get Professor Myrabo to write me the letter of recommendation for the NASA proposal.

(26) A few days after my meeting with Professor Tichy, I contacted Professor Myrabo about signing the signature sheet and writing my letter of recommendation for the NASA proposal. Professor Myrabo promised to take care of the signature sheet and the letter of recommendation before he left for a trip in middle of December 2002.

(27) On December 17, 2002, exactly one month after I had first spoken to Defendant c., Department Chairman Tichy, I went to see Professor Tichy once again to complain that Professor Myrabo had left on his trip without signing the signature sheet or giving me my letter of recommendation for the NASA proposal. I explained that the deadline for the proposal submission was January 31, 2003. Professor Tichy agreed to sign the signature sheet himself, and told me that he would talk to Professor Myrabo about the letter of recommendation when he got back from his trip.

FORM E(1)(d).3 extension 5

(28) On January 7, 2003, Professor Myrabo called me and asked me for directions on how to write a letter of recommendation. That question is a very silly question for a Professor of more than 20 years to ask. He must write several letters of recommendation for students each year. I gave Professor Myrabo instructions on what I thought would an appropriate letter of recommendation for this NASA proposal.

(29) On January 10, 2003, Professor Myrabo called me in my office and asked me if I could prepare a draft of my letter recommendation for him. One hour later, I went to his office with a prepared draft which he said he would sign and send to Anne Shumway at the Rensselaer Contracts and Grants office on Monday January 13, 2003. Anne Shumway was responsible for approving and mailing all correspondence dealing with the school's research funding.

(30) On Tuesday January 14, 2003, I went to see Rensselaer Contracts and Grants Administrator Anne Shumway at her office to see if Professor Myrabo had sent her my letter of recommendation for the NASA proposal. She said she had not received it yet.

(31) On Tuesday January 14, 2003, after I left Anne Shumways office, and I went straight over to see defendant c, MANE Department Head Tichy, to complain to him that Professor Myrabo was still holding up my NASA scholarship proposal by not providing Anne Shumway at Contracts and Grants with the last piece of paperwork needed to complete my NASA scholarship application; my letter of recommendation. Professor Tichy said he would call Professor Myrabo.

(32) By the end of that week starting January 12, 2003, Anne Shumway called me to tell me that she had received a letter of recommendation from Professor Myrabo; not necessarily the one that I wrote for him. I asked her to mail out the NASA scholarship application materials immediately before Professor Myrabo thought of any more changes he could make to the proposal.

(33) Professor Myrabo did email Anne Shumway the following week about more changes he wanted to make to my application, but it was too late, my NASA application had already been mailed out. Professor Myrabo put me through 8 months of abuse and stress for a research proposal that could have been sent out in less than 2 weeks. He certainly got me back for refusing that California job. The real kick in my pants is: after all that stress that defendant e, Professor Myrabo, put me through, NASA turned down my proposal claiming too many applications for a limited pool of funds; as I expected that they would. At other schools, I have had to apply for 10 or 20 different scholarships just to win one.

FORM E(1)(d).3 extension 6

(34) Defendant d, MANE Graduate Student Coordinator Antoinette Maniatty is assigns MANE Teaching Assistantships to individual graduate students. At the end of January 2003, I received notice from the MANE Department that I had been assigned as a Teaching Assistant for a course Professor Myrabo was giving in the spring of 2003. I immediately emailed defendant d, Graduate Coordinator Antoinette Maniatty that, due to recent friction between Professor Myrabo and myself over the NASA scholarship scandle, I would prefer to serve as a Teaching Assistant to a different professor.

(35) I met with Professor Maniatty in her office later in that week at the end of January 2003. I showed Professor Maniatty my letter of introduction from Assistant Dean of Disabled Student Services Debra Hamilton. I explained to Professor Maniatty that I had brain damage and was taking medication to prevent epileptic seizures. At this time, I also told Professor Maniatty of the lack of effort Professor Myrabo had taken in helping obtain scholarships or other educational funding. I explained that since Rensselaer changed its Teaching Assistantship policy in the fall of 2002 to limit Teaching Assistantships 4 semesters, and my fourth semester as Teaching Assistant would end in May 2003, I was in desperate need of the education funding that Professor Myrabo was denying me by his lack effort.

(36) Defendant d, Professor Maniatty, said that she would arrange a formal meeting, scheduled for early February 2003, consisting of herself and defendant c MANE Department Chairman John Tichy, and defendant e Professor Myrabo, and myself. I insisted on having a lawyer or other council present who could assist me or speak as an advocate for me. I agreed that Assistant Dean for Disabled Student Services Debra Hamilton might serve as my advocate at this formal meeting.

(37) The night before the early February 2003 formal meeting, defendant e, Professor Leik Myrabo conducted his second act of retaliation against me. At night, when everyone else had gone home, Professor Myrabo entered my student office in the Ricketts Aerolab and removed every research plot that I had taped on the wall. When I arrived at my office the morning of the formal meeting, I found my office walls were bare. I immediately notified Graduate Coordinator Maniatty of this new act of retaliation against me by Professor Myrabo.

(38) One hour later, at the early February 2003 formal meeting, defendant c, Department Head Tichy was noticeably absent. Graduate Coordinator Maniatty asked the first question to me: "Do you want Professor Myrabo to continue as your research advisor?" In light of this second act of retaliation by Professor Myrabo against me, I answered with a decisive "No." Professor Maniatty then told me that I would need to find a new research advisor. Some discussion followed relating to Rensselaer granting me a "Leave of Absence" and my returning the Ricketts Aerolab keys followed. Assistant Dean Hamilton did not act as vigorous advocate for me. Professor Myrabo was asked nothing and said nothing.

FORM E(1)(d).3 extension 7

(39) Within a few days of the early February 2003 formal meeting, I met with defendant f, Professor Kenneth Jansen after his Turbulence Modeling class. I had taken a computer fluid simulation class with Professor Jansen in the spring of 2002. During the spring of 2002, I had asked Professor Jansen if he would serve as member of my thesis committee and he had agreed. Now one year later, I explained the falling out that I had with Professor Myrabo, and I asked Professor Jansen if he would increase his duties to head my thesis committee as my thesis advisor. He told me that since he would already be helping me learn his computer fluid simulation code as a member of my thesis committee, it would be no extra burden to take on the role as my thesis advisor and head of my thesis committee. I thanked Professor Jansen for taking over as my thesis advisor on such short notice.

(40) Since I was enrolled in Professor Jansen's Turbulence Modeling class that spring of 2003, in an early February meeting with Professor Jansen, I also presented my letter from the Assistant Dean for Disabled Student Services Debra Hamilton so that he would be sure to allow me extra time to take tests in that class as provided by her office as one of the accommodations of the Americans with Disabilities Act of 1990. Professor Jansen agreed to accommodate my request.

(41) In mid-February 2003, I met with defendant d, Graduate Student Coordinator Antoinette Maniatty in her office, and I told her that Professor Jansen had agreed to become my new thesis advisor. Professor Maniatty told me that Professor Jansen would not be responsible for finding funding for my continued research, and that I should not expect him to pay me or financially support me in any way. Since it is customary for a research advisor to financially support his graduate students, and since Professor Jansen was supporting the research of other students in his lab, Graduate Coordinator Maniatty telling me that Professor Jansen would not be responsible for supporting me financially was an act of discrimination against me by excluding me from the same opportunities to obtain funding as other students at Rensselaer and in Professor Jansen's own laboratory.

(42) All of this political maneuvering in February 2003 stressed me out, fatigued me, and delayed the organizing of my 4 member thesis committee. It was not until April 2003 that I was able get all 4 members together in the same room for my Doctoral Candidacy Exam. By the time of my Doctoral Candidacy Exam, I was fairly exhausted from correcting other student's homework from my teaching assignment that semester, and from doing assignments and tests from the classes that I was taking. I had planned on taking my Doctoral Candidacy Exam much earlier in the semester when I was less busy with class work and much fresher. During the second hour of my Doctoral Candidacy Exam, I began to grow fatigued, and I failed to properly answer several ill posed and unreasonable questions from a member of my thesis committee with whom I had no prior experience or familiarity, Professor Debra Kaminski. She withheld her decision until I after I had satisfied her questions, so I did not pass my Doctoral Candidacy Exam that day.

FORM E(1)(d).3 extension 8

(43) The day after my failed Doctoral Candidacy Exam, I met MANE Department Chairman Tichy in the 2nd floor hallway of the JEC building. I told Professor Tichy that Professor Kaminski's questions during my exam were ill posed and unreasonable. I told Professor Tichy that the much of the reason that I failed to properly answer her questions was that by that time in the exam, I was growing fatigued from my illness. I told Professor Tichy that Professor Jansen who was presiding over my Doctoral Candidacy Exam made no attempt to explain to Professor Kaminski that I might be failing to answer her questions was because I was growing fatigued even though Professor Jansen knew that I am sick and prone to fatigue and exhaustion. I asked Professor Tichy to explain to Professor Kaminski that I might have failed to answer her questions properly because I was sick and growing fatigued by that point in the exam. Professor Tichy replied to me that Professor Kaminski was a longtime and well respected member of the MANE faculty, and that I should quit my complaining about my disability or trying to use it as excuse because he had no intention of helping me in any way.

(44) On May 5, 2003, I emailed Professor Jansen that I was too exhausted to take the final exam for his Turbulence Modeling class, and I would try to make up the work later in the summer if I felt better. On May 7, Professor Jansen emailed me back that I should go to the main office fill out some incomplete forms that he and I should sign. I was too ill to fill out forms. That same week, as I waited in line to take the Greyhound Bus back to Massachusetts, I needed to lie down on the dirty Albany bus station floor because of the all the dizzy spells and head rushes I was experiencing. I did not regain enough energy to restart working until mid-July 2003.

(45) Between September 1, 2003 and September 8, 2003, I made a week long trip to Renselaer Polytechnic Institute to handle a number of issues including getting Professor Jansen's fluids simulation code working, getting some transfer credits approved, and taking the final exam for Professor Jansen's Turbulence Modeling class. I had notified Professor Jansen the previous week to make sure that he would be available to work with me. On Monday September 1, 2003, I spent most of the day, 10 hours, traveling by bus and train out to Troy, New York from my home in Lowell, Massachusetts.

(46) On Tuesday September 2, 2003, I met with Professor Jansen in his SCOREC lab. My first order of business for that day was to ask Professor Jansen to sign a Rensselaer Transfer Credit approval form for 6 credits from two computer modeling classes that I had taken while getting my math masters at UMass-Lowell. As Professor Jansen specialty is computer modeling, he was the right person to ask. Professor Jansen refused to sign the Transfer Credit form for these two perfectly valid classes. Professor Jansen's refusal to sign this Transfer Credit form for me--a student that he responsible for as his thesis advisor--shows his complete apathy and discriminatory attitude towards helping me graduate.

FORM E(1)(d).3 extension 9

(47) That same day, Tuesday September 2, 2003, my second order of business was to get Professor Jansen's computer fluid simulation code working. Professor Jansen spent about a half hour setting up and running example computer simulation with blinding speed while I watched over his shoulder. He showed me on his website where to find some tutorial self-instructions to run his code. Professor Jansen told me to just go through the steps in the instructions, and then he moved to other side of the lab to work for the rest of the day to help with other students that live near campus that he works every single week, if not daily, unlike myself who lives over 10 hours by public transportation from campus, and can only travel to see him every few months.

(48) On Wednesday September 3, 2003, my first order of business was to see MANE Graduate Coordinator Antoinette Maniatty to ask her to sign my Rensselaer Transfer Credit approval form for 6 credits from two computer modeling classes that I had taken while getting my math masters at UMass-Lowell. I told her that Professor Jansen had refused to sign the Transfer Credit approval form for the two classes. I showed Professor Maniatty the syllabus for each class, the notebooks showing the work I had done for each class, and the UMass-Lowell transcripts showing the grades that I had received for each class. She signed the Rensselaer Transfer Credit form for both classes. I made a copy for my records, and brought the original over to the school's grade registrar's office.

(49) Later in the morning of Wednesday September 3, 2003, I went to Professor Jansen's SCOREC lab to try to get his computer code working. Professor Jansen told me that he would be out that day, but I spent the rest of the morning and part of the afternoon trying to get his computer code working. Late in the afternoon, I left to study for my final exam for Professor Jansen's Turbulence Modeling class.

(50) I spent the morning of Thursday September 4, 2003 taking Professor Jansen's Turbulence Modeling class final exam. Finishing that exam fulfilled the work that I needed to complete requirements for that class. Despite my finishing the all the work for that class, Professor Jansen withheld my grade for that class for a least another year.

(51) On the afternoon of Thursday September 4, 2003, I went back to Professor Jansen's SCOREC lab to continue trying to get his computer program running. Professor Jansen was working with one of his regular students, but did help me for 10 minutes with one particular problem that I was having getting his code running.

FORM E(1)(d).3 extension 10

(52) On Friday September 5, 2003, I spent most of the day working in Professor Jansen's SCOREC lab. I was getting frustrated that I still had not gotten his computer code working, and he was spending most of his time working with other students. I had planned to go back to Massachusetts that Friday at least able to get a simple case running with Professor Jansen's code. I asked Professor Jansen if would come in on Saturday to September 6, 2003 to give me special help without distractions from other students in the lab. Professor Jansen told me that he does not work on weekends, but he could help on Monday September 8, 2003.

(53) I made an unplanned weekend stay with friends in Schenectedy, NY. On Monday September 8, 2003, I spent all morning in the SCOREC lab waiting for Professor Jansen to come in and help me, but he never showed up. At 1:30 in the afternoon I left for the lab in disgust and headed for the bus to take me to the Greyhound Station in Albany where I could catch a bus back to Boston.

(54) On Tuesday September 9, 2003, I emailed Professor Jansen. In that email, I expressed that I was disappointed with my trip to see him because I had expected to be able to learn to run his code before I left. I expressed that I did not think that it was unreasonable to expect to be able to learn to run his code in a single trip because of my experiences with other similar computer fluid simulation codes. I told Professor Jansen that what I needed was a tutor to sit behind me for a couple of hours while I worked through a simple example. I even wrote that I would be willing to pay that tutor by the hour. In his email reply, Professor Jansen stated that with more notice he could have made better arrangements for me, even though I had checked with him the week before to make sure that he would have time for me. Professor Jansen stated that he did not think a tutor would be necessary, but we could cross that [tutor] bridge when or if we came to it. I saved that September 9, 2003 email exchange.

(55) In the next few months, I decided to concentrate on the heat transfer portion of my simulation code which I could do myself without Professor Jansen's help. I emailed Professor Jansen on December 20, 2003 to let him know I had been working on the heat transfer portion of my code. In mid-February, I finished the heat transfer portion of my code, so I started writing my thesis. On March 23, 2004 emailed Professor Jansen to let him know that the heat transfer portion of my code was finished and I had a pretty good start on my thesis draft. I told Professor Jansen in that March 23, 2004 email that I would mail him the thesis draft in a few weeks as soon as I completed it. In that March 23, 2004 email, I also told him that since my heat transfer portion of my code and my thesis draft was nearly complete, that the only drag on my completing my thesis was his fluid simulation code. I told that I hope he had more time to co-operate with me and help me learn his fluids code on my upcoming trip to the school. In his email reply on March 24, 2004, Professor Jansen referred me to the same webpage that did not help me back in September 2003. I saved that March 2003 email exchange.

(56) On May 12, 2004, I mailed thesis draft on CD to all my thesis committee members via the U.S. Postal Service. I also let them all know that I would be travel to the Rensselaer campus soon.

(57) On or about May 17, 2004, I called Professor Jansen to ask him his schedule to be sure he would be able to help me over the week starting Sunday May 23, 2004.

(58) On May 21, 2004, I let Professor Jansen know in no uncertain terms that the tutorials and self-instructions on his webpage were not helping me. For a third time, I told him that needed either himself or a tutor to teach his code in person. I told him that a tutor would be a better option since he had no patience with me. In his email replay, Professor Jansen stated that tutorials that he gave me to use are the exact same instructions that all his other students in his classes have used successfully. I am not the same as his other students. I doubt if any of his other students have brain damage or have undergone brain surgery, or need to take the same amount of medication as I do. I allege that Professor Jansen's failure to accommodate me by providing me with a tutor or teaching me himself is a failure to make a reasonable alteration to accommodate a disabled person. This failure to help me with his fluids code is damaging my ability to complete my Ph.D. degree and damaging my ability to get the jobs and earn the money that that degree would provide. In fact at the end of Professor Jansen's May 21, 2004 email reply, Professor Jansen actually threatens to block my degree by "becoming less interested in helping [me] achieve my goal in reaching my Ph.D." I allege that this email reply by Professor Jansen is Intimidation of a disabled person.

(59) On Sunday May 23, 2004, I took the commuter train from Lowell into Boston, took the subway to South Station, then I took a Greyhound Bus from Boston to Albany, then I took a CDTA bus to a friends' house in Schenectedy, NY; Rich and Junghwa Nolan.

(60) On Monday morning May 24, 2004, I had a long meeting with Professor Jansen in his office. We discussed my May 21, 2004 email where I asked for either extra help or a tutor to learn his code. Professor Jansen lectured me on how he treats his normal students. I told Professor Jansen that I am not a normal student, but a disabled student. I showed Professor Jansen my letter from the Assistant Dean for Disabled Students Services again. I reminded Professor Jansen once again that I have suffered a brain infection, stroke, and I have permanent brain damage. I even offered to show him my MRI brain scans which showed the hole in my brain. I brought those MRI brain scans along on my trip just in case Professor Jansen showed any disbelief in my claims to having brain damage. Professor Jansen said that he believed my claims of disability, and he declined to look at my MRI brain scans. After the meeting Professor Jansen met me in the SCOREC lab where he was remarkably helpful. Professor Jansen's change in the way he treated was amazing. Suddenly, Professor Jansen had developed the patience with me that I had wished for in my May 21, 2004 email to him. Over the afternoon of Monday May 24, 2004 and during the morning of Tuesday May 25, 2004, with Professor Jansen's help, I made amazing progress towards getting Professor Jansen's code to run. I did not get Professor Jansen's code to run, but I did learn how to setup the meshing preprocessor. My progress during this trip is proof that Professor Jansen can be helpful when he wants to be helpful. I was lulled into believing that Professor Jansen was actually serious about helping me finish my thesis. I was sorry to leave because I was making such rapid progress. I had to leave Rensselaer in the afternoon Tuesday May 25, 2004 because my friend Rich Nolan in Schenectedy was leaving on a trip out of the country with his wife, and I would have not had a place to sleep.

(61) On Wednesday morning May 26, 2004, I emailed Mike Libeau in Virginia from my home in Lowell, Massachusetts. In that email, I remarked that "Professor Jansen was suprizingly helpful to programming efforts during my 2 [day] trip to RPI." I expressed my surprise to Mike Libeau because I had been telling Mike since Professor Jansen first agreed to be my thesis advisor in the spring of 2003 how difficult it was to get Professor Jansen to work with me, and how very unhelpful Professor Jansen had always been.

FORM E(1)(d).3 extension 13

(62) On June 01, 2004, my joy at finally being able to mesh simulation cases using Professor Jansen's code ended with the first of series problems with his code that each cause delays in the completion of my thesis. Professor Jansen had loaded his new meshing code onto my computer during my May 23, 2004 to May 25, 2004 trip. On June 01, 2004, I was practicing with the new meshing software and it did not work. I emailed Professor Jansen it was giving me a "license expired error message". In itself, this delay was not a big deal. Little delays in research happen all the time. By Jun 03, 2004, Professor Jansen had emailed me a new license file. The "license expired error", and its solution, showed my dependence on Professor Jansen's cooperation to get his code to run.

(63) Also, in my June 01, 2004 email, I also notified that I would be coming out to the Rensselaer campus again on either the week June 14, 2004 or June 21, 2004. I gave him plenty of advanced notice.

(64) On June 07, 2004, I experienced another problem with Professor Jansen's code. Professor Jansen created a fix to my problem, and emailed me the solution on June 09, 2004.

(65) On June 15, 2004, I emailed Professor Jansen to ask him if he would available to help me in person at Rensselaer with more problems relating to original demo exercise and for additional help altering his code so that it would serve my thesis project. I suggested meeting Professor Jansen in his SCOREC on Thursday June 17, 2004, Friday June 18, 2004, and part of the week starting Monday June 21, 2004.

(66) On June 15, 2004, Professor Jansen emailed me back that he would be out on June 17 and June 18, 2004, but said he would be back by June 22, 2004. Professor Jansen also would have limited time to help me even if I came to see him on June 22, 2004. Since I could only get out to visit Professor Jansen in person once a month, while his other students who lived near campus could see him one or more times in a week, then to equalize the time he was spending me, Professor Jansen should have been spending more time helping me when I was able to get to Rensselaer to see him in person.

(66) In his June 15, 2004, email response, Professor Jansen also criticized me for not reading his Computer Science (CS) jargon loaded answers very carefully.

(67) On June 16, 2004, I replied to Professor Jansen's June 15, 2005 criticisms of my abilities to understand his Computer Science (CS) jargon loaded answers with the reply:

```
[ As far as your demo, I am still stuck the meaning of the word
"SIM_LICENSE_FILE environment". You are exactly right. I am not able to
read your emails very carefully. All this CS jargon goes right over my
head. I have a solid math and engineering background, but no specific
CS training. Unless you have time to write me a very detailed email
that tranlates all this computer science specific jargon into English,
it is probably best if we figure this out in person.]
```

(68) On June 16, 2004, Professor Jansen showed his growing irritation and discouragement with my email questions and criticisms of his jargon loaded speech with the email response:

```
[Joe,

I will try to help you but I am discouraged by your suggestion that you
don't/won't/shouldn't need to develop your CS skills to do a Ph.D. in
Computational Fluid Dynamics. What I ask of you is no different than I
ask of all of my Ph.D. students. Should you get extra help and extra
time yes. Should I do all of the configuration of your computer rather
than asking you to get a book or search online for a basic
understanding of bash or some other shell so that you understand what
an environment variableis and how to set one???? I don't think that
will be be a productive route for either of us. The plain truth (and I
have had graduated 5 Ph.D.s and not one of them with a CS undergrad) is
that CS is part of CFD and all my students pick up what they need from
whatever medium suits them. Meet me half way. Do some reading on the
topic so that when we get together it is not me setting it up for you
because, as you are probably aware, things are always changing in a
research code environment and a basic understanding of at least one
computer shell is necessary  (doesn't matter to me if it is bash, csh
or whatever...they all have means of setting environment variables).

Try to find a source that confirms that the answer to your question is
for you to execute the following command (in bash)]
```

**FORM E(1)(d).3 extension 15**

(69) By June 16, 2004, I had been in college for 10 years and 8 months at both the University of Massachusetts and Dartmouth College, and I had never heard the computer science jargon words "bash" or "shell" used by any engineering or mathematics professor. At both schools, I had worked with both UNIX operating system main frame computers, and the more common and familiar Microsoft Windows operated personal computers, as well as older Microsoft DOS operated personal computers. Neither of the words "bash" or "shell" as they are used by computer scientists appear in the most modern English dictionaries. To figure out what the computer science jargon words "bash" and "shell" that Professor Jansen was referring to, I did an internet search. On the Barnes and Noble bookstore website, I learned that they had a book in stock called "Learning the bash shell." On June 17, 2004, to show Professor Jansen that I serious about learning what "bash shell" meant, ordered that book from Barnes and Noble for 36 dollars and 56 cents including shipping. The book arrived at my house on June 20, 2004. In the first three paragraphs of the preface to that 36 dollar book, I learned that "shell" is computer science jargon for a window on a UNIX based computer on to which commands are typed, and that a "bash" is a common list of commands that the UNIX window can accept such as copying files or changing directories. Since I had been working UNIX operated computers for the last 10 years, I knew most of the common computer commands, and I felt like I wasted 36 dollars and weeks of time because Professor Jansen uses the computer science jargon "bash shell" that computer scientist use instead of the English phrase "computer command window", and  Professor Jansen did not have the patience or teaching skill to explain to me that by using the jargon phrase "bash shell", he meant the common American English phrase "computer command window."

(70) Also, in his June 16, 2004 email response, Professor Jansen agreed that I "should get extra help and extra time". Despite this admission, Professor Jansen was spending less time helping me than he was spending helping his other students.

(71) Between Monday June 21, 2004 and Friday June 25, 2004, I was in New York. On Monday June 21, 2004, I spent the day traveling. On Tuesday Morning June 22, 2004, I met in person with Professor Jansen in his SCOREC lab. My first order of business was to discuss a written schedule that I created that set accomplishment milestones on my thesis project that would allow me to graduate from Rensselaer by April 01, 2005. Among the major milestones on my schedule were: 4) to be able to run Professor Jansen's code using my own meshes by July 30, 2004; 7) to have my radiation and chemistry code interfaced working with Professor Jansen's fluids code by August 30, 2004; 10) complete my simulation studies by December 30, 2004; and 13) defend my thesis by April 01, 2005. Professor Jansen agreed that all my milestones were reasonable, and he agreed that I could be finished by April 01, 2005.

FORM E(1)(d).3 extension 16

(72) My second order of business during that Tuesday Morning June 22, 2004 meeting with Professor Jansen was to discuss funding. Even though Graduate Coordinator Antoinette Maniatty told me not to ask Professor Jansen for financial support, I asked Professor Jansen if there was anyway that he could get funding for me either for my project or by doing extra work on other projects that he had funding for and was paying his other students to do. Professor Jansen told me he had no extra work or no money to pay me. Professor Jansen's failure to help me when he was financially supporting other students was a denial of participation in services that he provided to his other students.

(73) During that Tuesday Morning June 22, 2004 through Friday afternoon June 25, 2004 trip was irritated and annoyed that I was in his lab. On several occasions during that trip, Professor Jansen spoke rudely to me or insulted me. Once, during that week, Professor Jansen rudely told me that I was arrogant. I have heard other students say behind his back that Professor Jansen was the arrogant person. I did not care how rude or insulting Professor Jansen's was as a long as I was seeing progress and getting my thesis accomplished. I spent most of my time that week slowly working through problems using Professor Jansen's difficult to use CD tutorial self-help lessons. He spent only 10 minutes working with me on my programming problems on Tuesday June 22, 2004, while he spent more that one hour working with another one of his students who sees him every week.

(74) Professor Jansen spent no time at all working with me on Wednesday June 23, 2004.

(75) On Thursday June 24, 2004, Professor Jansen once again spent only 10 minutes working with me while he spent over one hour working with a different student who sees also him weekly, not every couple of months like me. Professor Jansen was definitely not giving me equal time, never mind extra time.

(76) Also Thursday June 24, 2004, I needed Professor Jansen to ask one of the SCOREC staff, Christophe Dupre, to install a computer drawing program, Solid Works, on the one of the SCOREC lab computers. I needed Solid Works so that I could make some drawings for my project. Professor Jansen did ask Christophe Dupre to install the Solid Works software that Thursday June 24, 2004 afternoon.

(77) By Friday Morning June 25, 2005, Christophe Dupre still had not installed the Solid Works software that I needed to continue working. Professor Jansen knew that I planned to leave campus that Friday afternoon, and so he knew my time was precious. I was worried that Christophe had forgotten about me. I knocked Christophe's office door, but he was not in. I knocked on Professor Jansen's office door, and he was helping another one of his students. I simply asked Professor Jansen to ask Christophe Dupre again to install the Solid Works software in the SCOREC lab. Professor Jansen was mad that I had interrupted his meeting with another student, but said that he would email Christophe with a reminder about installing the Solid Works software in the SCOREC lab.

FORM E(1)(d).3 extension 17

(78) After 1:00 PM that Friday June 25, 2004 afternoon, Christophe had still not installed the Solid Works software, so I went Christophe's office again, but he was not in his office. I knocked Professor Jansen's once again to find him meeting with a different student. I explained again to Professor Jansen that I needed to leave campus by the end of the day, and that I needed Christophe to install the Solid Works software for me right away so I that I could get my drawings done by the end of the day so that I could go home to Massachusettts. Before he shut his door, Professor Jansen angrily and rudely said to me "MY NAME IS NOT CHRISTOPHE!"

(79) About 3:00 PM that Friday June 25, 2005 afternoon, Christophe Dupre did come into the SCOREC lab and installed the Solid Works drawing software that I needed to do my drawings. Professor Jansen popped into the lab for about 3 minutes about 5:00 PM that Friday afternoon just long enough to watch me email my completed drawings from the SCOREC computer to back to my own computer.

(80) On June 27, 2004, I was back home in Lowell, Massachusetts. I had built a mesh using the drawings I had made in last few minutes of my June 21-June 25, 2004 trip to Rensselaer, but I was having trouble getting it my mesh to run in Professor Jansen's code. If Professor Jansen had insisted that Christophe get the drawing software setup more quickly, and if Professor Jansen had spent more time working with me during the trip, I would have encountered the problem on campus. Now I had to email Professor Jansen with news of this next problem with his code. In this email, I described the error that code was getting. I also sent Professor Jansen the case files so that he could try to run the case himself.

(81) On June 28, 2004, Professor Jansen replied to my email by saying that he thought my problem might be my computer stack size. Professor Jansen also said that he would try to run the case himself:

```
(
If I can find some time tomorrow I will try to run your case and see if
I can figure out if this is the problem or if it is something else.)
```

Profofessor Jansen never did take the time to run my case himself.

(82) In Professor Jansen's June 28, 2004 email reply, Professor Jansen replied he thought my computer stack size was set to small, but he did not give me a number to reset my stack size to. And so Professor Jansen began a cruel game of withholding the number until he had forced me to go on a wild goose chase to find the number myself. I was delayed for 3 days searching in vain for the correct stack number, while all along, Professor Jansen could have given me the correct number in less than a minute. What a cruel jerk Professor Jansen is. He is the meanest teacher I have ever encountered.

(83) Finally after several emails and 3 days of searching on my own for the correct stack number, on July 01, 2004, I finally got Professor Jansen to tell me the correct stack number: 1000000. See how easy numbers are to write.

(84) On July 01, 2004, I emailed Professor Jansen with another problem. I increased the stack size to 1000000 like he said, and now the case ran but only for a few iterations before it unexpectedly stopped. Professor Jansen replied that I should go back to look at his difficult to use CD tutorial self-help lessons. Professor Jansen even admitted that he knew sounded like a broken record. Every time I asked him a question, Professor told me to replay his difficult to use CD tutorial self-help lessons. Professor Jansen's code was starting to look to like a real lemon. For two and a half years, Professor Jansen had been lecturing me and other students in classes on how useful his code was.

(85) On July 07, 2004, I emailed Professor Jansen that I was having more problems getting his code to run. I also called Professor Jansen's office but got only his answering machine. Professor Jansen replied via email, but he did not give me an answer that cured my problem.

(86) On July 08, 2004, I emailed Professor Jansen that I was having a problem understanding on his to difficult to use CD tutorial self-help lessons on running the OpenDX postprocessor. He replied that running OpenDX was trivial to him. Easy for him to say, but he does not have the teaching temperment to explain OpenDX either in his tutorial or his emails.

(87) On July 09, 2004, I called Professor Jansen twice, once at 2:50 PM, and once at 4:00 PM, but I only got Professor Jansen's answering machine.

(88) On July 10, 2004, I emailed Professor Jansen that I was still having trouble with a case I was trying to run. I attached my case file in my email him the case so that Professor Jansen could try to get it running himself. He never did.

(89) On July 12, 2004, at 9:49 AM, Professor Jansen sent me an email reply with information on an automatic debugger he said that I could use to diagnose the problem myself. It seemed to me that getting the automatic debugger to run was just as difficult as getting Professor Jansen's fluids code to run. I have worked with automatic debugger's before and they are not so automatic. Automatic debuggers rarely point out where the real bug in a code is.

(90) On July 12, 2004, I called Professor Jansen at 10:24 AM to see if I could speak to him over the phone about his debugger message, and to ask him he could try running the my simulation case himself to see if he could spot the problem. Because he did not answer the phone, I left my message on Professor Jansen's answering machine.

(91) On July 12, 2004, at 12:52 PM, Professor Jansen sent me an email to replay his difficult to use CD tutorial self-help lessons on debuggers.

(92) On July 13, 2004, at 8:49 AM, I sent Professor Jansen an email that asked once again how to use the automatic debugger as follows:

```
(Hopefully, you can tell me how to get the debugger
running over email or by phone. If you can not, I will
have make a trip out to RPI this week to see if you
can help me in person. I had not planned to travel
until after the Democratic National Convention in
Boston ends on July 30. The Boston Train station is
closed by US Marshalls until after the DNC ends, and
my trip out to Albany would be more difficult than the
usual 8 hours if I cannot go through Boston.  )
```

(93) On July 13, 2004, at 10:31 AM, I called Professor Jansen on the phone to once again how to use the automatic debugger. Professor Jansen did not answer his phone, so I repeated my morning email message to his phone answering machine.

(94) On July 13, 2004, at 12:03 PM, Professor Jansen replied to my morning email with an email reply with more difficult to understand instructions on how to use the debugger.

(95) On July 13, 2004, at 3:44 PM, I called Professor Jansen's office again to clarify the debugger information that he sent by email at 12:03 PM. Again, I got his phone answering machine.

FORM E(1)(d).3 extension 20

(96) On July 13, 2004, at 3:49 PM, in Professor Jansen's reply to my reply to his 12:03 PM email with my plan of action to attempt to implement the debugger, Professor Jansen emailed me with the simple and uncaring message:

```
(go for it.

Since you work on only one machine that may be so.)
```

(97) On July 15, 2004, at 11:01 AM, I called Professor Jansen's office on the phone. This time, Professor Jansen did answer his phone. Professor Jansen sounded annoyed and irritated that I had called him. I tried asking him some questions about the automatic debugger; specifically about the difference between the results of debugging manually one line at a time and using the automatic debugger. Professor Jansen cut me off with a lecture about how all his other students learn to use the automatic debugger using his tutorials by themselves, and that I would have to do so as well. I was stunned. Professor Jansen said that he was busy, but did not give a better time to call him. Professor Jansen said good bye. I thanked him for his time. The entire call lasted less than 3 minutes according to my AT&T records.

(98) On July 19, 2004, I emailed Professor Jansen that would not be using his code for my Ph.D. thesis, and that I was dropping him as my thesis advisor. I was polite as possible in that email, because Professor Jansen was still withholding the credits from his Turbulence Modeling class that I had taken with Professor Jansen in the spring of 2003.

FORM E(1)(d).3 extension 21

(99) On August 9, 2004, I met with Graduate Student Coordinator Antoinette Maniatty in her office. I explained to her that Professor Jansen had grown tired of working with me, and on July 15, 2005, he refused to talk to me on the phone about more trouble I was having with his code. I told that Professor Maniatty, that because of Professor Jansen's behavior, I had dropped him from my thesis committee. I asked her to help me find another thesis advisor. She told me, that of the hundreds of professors at Rensselaer, there was no other person on campus except Professor Jansen who could help me with my thesis.

(100) I do not believe Professor Jansen was the only person who works at Rensselaer who could help with my thesis since Professor Jansen had guest speakers give lectures on computer fluid modeling in his Computer Fluid Dynamics class that I took in the spring of 2002. Graduate Student Coordinator Maniatty's disinterest in helping me find a new thesis advisor was a failure of an administrator to prevent discrimination against a disabled person.

(101) At that August 9, 2004 meeting, I told Professor Maniatty how well I had been treated at my previous colleges; the University of Massachusetts and Dartmouth College. Professor Maniatty flippantly told me I should "go back to University of Massachusetts where the professors were much more fond of me." Graduate Student Coordinator Maniatty flip remark to me to "go back to University of Massachusetts where the professors were much more fond of me" shows her apathy towards disabled students.

(102) At that meeting August 9, 2004, I also told Graduate Student Coordinator Maniatty that Professor Jansen was still withholding my credits from his spring 2003 Turbulence Modeling class even though I had completed all the work for that class. She told me to email Professor Jansen myself and ask him to turn in those credits to the registrar.

(103) On Tuesday August 17, 2004, I emailed Professor Jansen to tell him that I checked with the Rensselaer Registrar, and the registrar had still not received my grade and credits for his Turbulence Modeling class that I took with him in the spring of 2003. Professor Jansen emailed me back, and replied that he had turned my credits "at least a week ago."

(104) On October 13, 2005, I attended the Beamed Energy Propulsion Conference at Rensselaer. While on campus, checked with the Rensselaer Registrar once again, and found my grade and credits from Professor Jansen's Turbulence Modeling class had still not been entered into my record.

(105) On March 08, 2005, I finally received confirmation from the Rensselaer Registrar that my grade and credits for Professor Jansen's spring 2003 Turbulence Modeling class had been entered into my record.

FORM E(1)(d).3 extension 22

Summary of Facts

Defendant a, Rensselaer Polytechnic Institute violated ADA Title III rules by:

(106) As described in the Facts of my case, defendant a, Rensselaer Polytechnic Institute, as the overall governing institution which has the responsibility for supervising defendants b, c, d, e, and f violated prohibitions of ADA Title III Section 302(D) Admistrative Methods subsection (D) subsection (ii) which prohibits methods of administration that "perpetuate the discrimination of others who are subject to common administrative control."

Defendant b, the MANE department violated ADA Title III rules by:

(107) As described in the Facts of my case, defendant b, the Mechanical Aeronautical Nuclear Engineering (MANE) Department of Rensselaer Polytechnic Institute, as the direct governing body which has the responsibility for supervising defendants c, d, e, and f violated prohibitions of ADA Title III Section 302(D) Admistrative Methods subsection (D) subsection (ii) which prohibits methods of administration that "perpetuate the discrimination of others who are subject to common administrative control."

Defendant c, MANE Department Chairman Tichy violated ADA Title III rules by:

(108) As described in paragraphs (25), (27), and (31), Defendant c, MANE Department Chairman Tichy, by ignoring Assistant Dean Debra Hamilton's letter introducing me as a disabled student that I presented to him in November of 2001, Professor Tichy allowed the continued discrimination against me by defendant e, Professor Myrabo, and therefore violated prohibitions of ADA Title III Section 302(D) Admistrative Methods subsection (D) subsection (ii) which prohibits methods of administration that "perpetuate the discrimination of others who are subject to common administrative control."

(109) As described in paragraphs (36) and (38), Defendant c, Department Chairman Tichy's lack of involvement in the February 2002 meeting was a discriminatory violation of ADA Title III Section 302 part (2) specific prohibitions (A) Discrimination. Subsection (ii) "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations."

FORM E(1)(d).3 extension 23

(110) As described in paragraphs (42) and (43), Defendant c, Department Chairman Tichy's lack of interest in my fate was a second discriminatory violation of ADA Title III Section 302 part (2) specific prohibitions (A) Discrimination. Subsection (ii) "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations."

(111) As described in paragraph (43), Defendant c, Department Chairman Tichy's disinterest in my fate, and by making himself unavailable to my pleas to prevent Defendant f, Professor Jansen's discriminatory practices against me, Department Chairman Tichy perpetrated a violation of ADA Title III Section 302 part (2) specific prohibitions (A) Discrimination. Subsection (iii) "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden."

Defendant d, MANE Department Graduate Student Coordinator Maniatty violated ADA Title III rules by:

(112) A described in paragraph (41), defendant d, MANE Graduate Student Coordinator Maniatty exposed me to an unequal benefit by telling me that I no right to expect help in obtaining financial support from Professor Jansen that other students advised by Professor Jansen recieved. The denial of my right to equal opportunity for funding is a violation of the ADA Title III protections covered under section 302(a) General rules and under section 302(A) Activities, and under section 302(A) Activities, subsection (ii) participation in an unequal benefit, and under section 302(A) Activities, subsection (iii) Seperate benefit..

(113) As described in paragraphs (99), (100), (101), and (102), defendant d, MANE Graduate Student Coordinator Maniatty, rather than attempting to remedy my situation after the July 2005 phone call that ended my relationship with Professor Jansen, Graduate Coordinator Maniatty perpetuated the discrimination of my rights to equal opportunities to the same level of research aid he was giving his other students by telling me to transfer to a different school; specifically she told me that I "should go back to The University of Massachusetts where they were much more fond of " him. By perpetuating the discrimination against me, Graduate Coordinator Maniatty violated prohibitions of ADA Title III Section 302(D) Admistrative Methods subsection (D) subsection (ii) which prohibits methods of administration that "perpetuate the discrimination of others who are subject to common administrative control."

FORM E(1)(d).3 extension 24

(114) As described in paragraphs (99), (100), (101), and (102), defendant d, MANE Graduate Student Coordinator Maniatty continued to allow discrimination against me as defined in ADA Title III section 302 part (2) specific prohibitions (A) Discrimination. Subsection (ii) by her "failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations."

(115) As described in paragraphs (99), (100), (101), and (102), defendant d, MANE Graduate Student Coordinator Maniatty continued to allow discrimination against me as defined in ADA Title III section 302 part (2) specific prohibitions (A) Discrimination. Subsection (iii) by her "failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden."

Defendant e, Professor Myrabo violated ADA Title III and ADA Title V rules by:

(116) As described in paragraph's (1), (2), (3), (4), (18), (20), (24), (26), (28), and (30), Defendant e, Professor Myrabo's lack of effort in obtaining funding for my research was a denial of participation of a disable person and violated ADA Title III protections covered under section 302 (1) General prohibition (A) Activities (i) denial of participation.

(117) As described in paragraph's (11) through (15), Defendant e, Professor Myrabo's attempt to force me to take the job in California that I was too ill to take, was an act of discrimination on the basis of my disability and a failure make a reasonable modification of practices in violation of ADA Title III protections covered under section 302(a) General rules and under section 302 (A) subsection (ii).

(118) As described in paragraph's (1), (2), (3), (4), (11) through (15), (18), (20), (24), (26), (28), and (30), Defendant e, Professor Myrabo's retaliation against me for refusing to take that job in California by refusing to sign my client's funding proposal was a violation of the ADA Title V section 503 (a) protections against retaliations.

(119) As described in paragraph's (34) through (37), Defendant e, Professor Myrabo's retaliation against my client's reporting his behavior to MANE Administrators Professor Tichy and Professor Maniatty by removing my client research plots from my office the night before the meeting constituted a second violation of the ADA Title V section 503 (a) protections against retaliations.

FORM E(1)(d).3 extension 25

Defendant f, Professor Jansen violated ADA Title III and ADA Title V rules by:

(120) As described in paragraphs (41) and (72), defendant f, Professor Jansen discriminated against me in excluding me from the same opportunities to obtain research funding that he does his other students in violation of ADA Title III protections covered under section 302(a) General rules and under section 302(A) Activities, and under section 302(A) Activities, subsection (ii) participation in an unequal benefit, and under section 302(A) Activities, subsection (iii) Seperate benefit.

(121) As described in paragraphs (45), (47), (49), (51), (52), (53), (54), (55), (66), (68), (70), (73), (74), (75), (76), (77), (78), (79), (80), (81), (82), (83), (84), (85), (86), (88), (90), (91), (92), (93), (94), (95), (96), and (97), defendant f, Professor Jansen discriminated against me in excluding me from the same opportunities to obtain of help and research advice that he provides to his other graduate students violates ADA Title III protections covered under section 302(a) General rules and under section 302(A) Activities, and under section 302(A) Activities, subsection (ii) participation in an unequal benefit, and under section 302(A) Activities, subsection (iii) Seperate benefit.

(122) As described in paragraphs (54), (55), (58), and (70) defendant f, Professor Jansen discriminated against me by not accommodating me with cooperation, extra time, or a tutor as I had requested which is a violation of ADA Title III protections covered under 302 (1) General prohibitions section (A) Activities, subsection (i) Denial of participation. It shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity.

(123) As described in paragraphs (54), (55), (58), and (70), defendant f, Professor Jansen discriminated against me by not accommodating me with cooperation, extra time, or a tutor as I had requested which is a violation of ADA Title III protections covered under 302 (2) Specific prohibitions section (A) Discrimination, subsection (a) sub-section (ii) a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

(124) As described in paragraph (58), defendant f, Professor Jansen intimidated me by threatening to prevent me from obtaining his Ph.D. after I expressed in an email that I was dissatisfied with the amount of help and advice that Professor Jansen was providing me. This threat by Professor Jansen was a violation of the ADA Title V section 503 (b) protections against Interference, Coercion, or Intimidation.

FORM E(1)(d).3 extension 26

(125) The ADA Title I laws govern the behavior of Federal Government Agencies towards Americans with disabilities. The ADA Title III and ADA Title V laws govern private institutions or businesses that receive any type of federal assistance. The ADA Title III laws follow the example set in ADA Title I. The Americans with Disabilities Act of 1990 follows from the Rehabilitation at of 1973 which in turn follows from the Civil Rights Act of 1964. Therefore violations of ADA 1990 Title III and ADA 1990 Title V by defendents a,b,c,d,e, and f, also fall under the guidelines setup in the Rehabilitation Act of 1973 and the Civil Right Act of 1964.

(126) In violating the ADA Title III and ADA Title V laws, the defendents a,b,c,d,e, and f, also violated Section 504 of the Rehabilitation Act of 1973, specifically section 794 (a) promulgation of rules and regulation which states in part: No otherwise individual with a disability in the United States, ... , shall, solely by reason of his or her disability, be excluded from or denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

(127) Section 504 of the Rehabilitation Act of 1973, specifically section 794 (b) "Program or Activity" defined, states in part: For the purposes of this section, the term "program or activity" means all of the operations of -- .... (2)(A) a college, university, or other postsecondary institution ...

(128) Section 504 of the Rehabilitation Act of 1973, specifically section 794 (d) Standards used to determine violation of a section, states that: The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under Title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201-12204 and 12210), as such sections relate to employment.

(129) Section 504 of the Rehabilitation Act of 1973, specifically section 794a. Remedies and attorney fees (a)(1), states in part: The remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 ( 42 U.S.C. 2000e-16) ... shall be available, ... to any employee or applicant for employment aggrieved by the final disposition of such complaint, or by the failure of to take final action on such complaint. In fashioning an equitable or affirmative action remedy under such section, a court may take into account the reasonableness of the cost of any work place accommodation, and the availability of alternative therefore or other appropriate relief in order to achieve an equitable and appropriate remedy.

FORM E(1)(d).3 extension 27

(130) Section 504 of the Rehabilitation Act of 1973, specifically section 794a. Remedies and attorney fees (2), states that: The remedies, procedures, and rights set forth in Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistant under section 794 of this title.

(131) Paragraph (130) means that I am allowed to sue for compensation for damages as set in Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.).

(132) Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), specifically Sec. 2000d-4. Federal authority and financial assistance to programs or activities by contract of insurance or guaranty, states that: Nothing in this subchapter shall add or detract from any existing authority with respect to program or activity under which Federal financial assistance is extended by way of a contract of insurance or guaranty.

(133) Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), specifically Sec. 2000d-4a. "Program or activity" and "program" defined, states in part that: For the purpose of this subchapter, the term "program or activity" and the term "program" mean all the operations of -- ... (2)(A) a college, university, or other postsecondary institution, or a public system of higher education; or ....

(134) As students of Rensselaer Polytechnic Institute receive subsidized loans and grants from the Federal government, then Rensselaer Polytechnic Institute and its faculty are subject to laws stated in the Civil Rights Act of 1964, as defined in paragraphs (132) and (133).

7.   **PRAYER FOR RELIEF**

WHEREFORE, the plaintiff requests that this Court grant the following relief:

I would like full reinstatement as a Ph.D. student at Rensselaer with all privileges accorded other Ph.D. students including library privileges and a research advisor who will make every effort to help me obtain my Ph.D. degree, successfully complete my thesis code, and help me obtain the funding to support myself and my research project. As I have suffered both financial and psychological damages as a result of the defendant's actions and violations of the Americans with Disabilities Act. And as my disability limits my ability to take many jobs for which I am educationally qualified, I am much less able to recover from financial damages than a healthy person. My disability also magnifies the damage I experience from psychological stress. I therefore request the Court to grant me $2,150,000 dollars in relief and damages itemized as follows:

Lost wages:
        Year 2003=$18,000   (research assistant)
        Year 2004=$18,000   (research assistant)
        Year 2005=$70,000   (Full time Ph.D. Engineer)
        Year 2006=$80,000   (Full time Ph.D. Engineer)
        Year 2007=$85,000   (Full time Ph.D. Engineer)
Lost Tuition/Scholarship aid:
        Year 2003=$25,000
        Year 2004=$25,000
Reimbursement for Tuition so I can complete my Ph.D. degree:
        Year 2005=$25,000
        Year 2006=$25,000
        Year 2007=$25,000
Reimbursement for Room and Board so I can complete my Ph.D. degree:
        Year 2005=$18,000
        Year 2006=$18,000
        Year 2007=$18,000
Aid to hire a private tutor so that I can complete my computer code for my Ph.D. degree:
        Year 2006=$100,000
        Year 2007=$100,000
Punitive damages against the defendants to punish violations of ADA laws and encourage future compliance with ADA laws:
        Defendant a=$250,000
        Defendant b=$250,000
        Defendant c=$250,000
        Defendant d=$250,000
        Defendant e=$250,000
        Defendant f=$250,000

---

Total Relief and Damages sought=$2,150,000

FORM E(1)(d).4

I declared under penalty of perjury that the foregoing is true and correct.

DATED:  9/30/2005

Joseph P. McInerney

Signature of Plaintiff a, Joseph P. McInerney

Form E(1) d.4 extension 1