UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JOSEPH P. McINERNEY,

                                        Plaintiff,

                vs                                              1:05-CV-1267

RENSSELAER POLYTECHNIC INSTITUTE;

                                        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                            OF COUNSEL:

JOSEPH HEIN, ESQ.
Attorney for Plaintiff
6486 French's Hollow Road
Altamont, NY 12009-9404

PATTISON, SAMPSON, GINSBERG
  & GRIFFIN, P.C.                                       MICHAEL E. GINSBERG, ESQ.
Attorneys for Defendant
22 First Street
P.O. Box 208
Troy, New York 1218l-0208

DAVID N. HURD
United States District Judge

## AMENDED MEMORANDUM-DECISION & ORDER

## I. INTRODUCTION

        Joseph P. McInerney ("plaintiff") brings ten causes of action against defendant

Rensselaer Polytechnic Institute ("RPI" or "defendant""), a private education university

principally located in Troy, New York.  Plaintiff alleges, as his First and Second Causes of

Action, that defendant intentionally discriminated against plaintiff in violation of Title III of the

Americans with Disabilities Act ("Title III of the ADA") and Section 504 of the Rehabilitation

Act ("§ 504") by failing to provide plaintiff with sufficient rest breaks during his Doctoral Candidacy Exam. Plaintiff also alleges, as his Third Cause of Action, that defendant discriminated against plaintiff in violation of Title III of the ADA by refusing to communicate to the doctoral candidacy examiners the nature of the problems plaintiff experienced during his exam. Furthermore, plaintiff alleges as his Fourth and Fifth Causes of Action that defendant discriminated against plaintiff in violation of Title III of the ADA and § 504 by failing to provide plaintiff with a second opportunity to take the doctoral candidacy exam.

As his Sixth Cause of Action, plaintiff alleges that defendant discriminated against plaintiff in violation of Title III of the ADA by failing to help plaintiff understand and use a computer fluids code. Plaintiff's Seventh Cause of Action alleges that defendant discriminated against plaintiff in violation of Title III of the ADA by refusing to help plaintiff find a thesis advisor. Plaintiff's Eighth Cause of Action alleges that defendant discriminated against plaintiff in violation of Title III of the ADA and Title V of the ADA by refusing to allow plaintiff to change to "active" status and resume his education at RPI. Additionally, plaintiff alleges as his Ninth Cause of Action that defendant's refusal to allow plaintiff to change to "active" status constituted an act of discrimination in violation of § 504. Finally, plaintiff's Tenth Cause of Action alleges that defendant breached its agreement with plaintiff in violation of state contract law by denying plaintiff service at RPI's Student Health Center.

Defendant moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 for all ten causes of action. Plaintiff opposes. Defendant's motion was considered without oral argument.

## II. **BACKGROUND**

In August 2000, plaintiff suffered a bacterial brain infection, causing a stroke and permanent brain damage to the left side of his brain. (Pl.'s Am. Compl., Dkt. No. 55, ¶ 6-7.) He underwent cardiac and brain surgery and slowly recovered from the stroke which left him unable to walk or speak. (Id.)

Despite the relative success of the cardiac and brain surgeries, plaintiff continues to suffer from periodic epileptic seizures, chronic fatigue, sleepiness, dizziness, head rushes, and leg pain. (Ex. M to Hein Aff.) Consequently, plaintiff takes anti-seizure medication, and while the medication helps reduce the risk and occurrence of seizure, the side effects of plaintiff's medication include drowsiness, dizziness, and lightheadedness. (Id.) There is a close correlation between the degree of these symptoms and the amount of time he spends intensively talking, reading, typing, or working at the computer. (Id.) Plaintiff is able to reduce these symptoms with frequent breaks and intermittent time off. (Id.)

In August 2001, when plaintiff enrolled in the Mechanical Engineering Graduate Program at RPI, he was still suffering from seizures, dizziness, head rushes, headaches, tension, difficulties with concentration, aphasia, muscle pain, extreme fatigue, and chronic sleepiness. (Id.) Accordingly, plaintiff requested accommodations from RPI's Disabled Students Services Office by submitting a "Student Fact Sheet" on August 28, 2001. (Pl.'s Statement of Facts, Dkt. No. 94, ¶ 11; Def.'s Statement of Facts, Dkt. No. 90, ¶ 11.) Specifically, plaintiff requested fifty percent extra time to complete tests, which was granted by Debra Hamilton, the Assistant Dean for Disabled Student Services. (Def.'s Statement of Facts, Dkt. No. 90, ¶ 11.) Ms. Hamilton also sent a letter to RPI faculty informing them of plaintiff's condition and the additional test time which he had been granted. (Ex. F to

Ginsberg Aff.)  A copy of this letter was also sent to plaintiff's treating physician, Dr. Ted Burns.  In his reply letter, Dr. Burns agreed with the accommodation and reiterated that plaintiff's condition, combined with the accompanying medication, causes him to have trouble concentrating and requires him to take frequent mental breaks.  (Ex. G to Ginsberg Aff.)

As a student at RPI, plaintiff was required to pay a fee to the Student Health Center ("Health Center").  (Pl.'s Aff., Dkt. No. 93, ¶ 125.)  On March 22, 2002, plaintiff was experiencing frequent head rushes and dizzy spells and was having trouble thinking straight, speaking, and reading.  (Id.)  Plaintiff went to the Health Center because he wanted to "be near medical help in case his dizzy spells turned into a seizure."  (Id.)  Plaintiff informed the staff at the Health Center that he "thought he was going to have a seizure," and that he "just needed a safe place to sleep."  (Id.)  The staff, consistent with the Health Center's policy that students are not permitted to occupy beds solely for the purpose of resting or sleeping, denied plaintiff's request and informed plaintiff that if it was an emergency, then he should seek medical attention at the local hospital.  (Id.; Lawrence Aff., Dkt. No. 86-8, ¶ 5.)  Plaintiff responded that it was not an emergency, and he just needed a "safe place to sleep."  (Id.) Ultimately, plaintiff was denied a bed and was forced to walk to the local hospital, where he was given a place to rest.

Pursuant to the doctoral degree requirements of RPI's Department of Mechanical Aeronautical Engineering and Mechanics (MANE), of which plaintiff was a student member, all doctoral candidates are required to, inter alia, choose a thesis advisor, select a plan of study, pass an Oral Department Qualifying Exam ("Qualifying Exam"), and pass a Doctoral Candidacy Exam ("Candidacy Exam").  (Ex. L to Hein Aff.)  RPI also requires that a doctoral candidate's dissertation advisor (a.k.a. thesis advisor) be a full-time tenure-track member of

the RPI faculty.  (Def.'s Statement of Facts, Dkt. No. 90, ¶ 82.)  In satisfaction of these requirements, plaintiff chose Professor Leik Myrabo as his original thesis advisor. (McInerney Dep., Ex. A to Ginsberg Aff. at 113:1.)  His plan of study "involved laser-supported detonation as a propulsion method for light craft space vehicles powered by laser."  (Def.'s Statement of Facts, Dkt. No. 90, ¶ 18.)

The Qualifying Exam requires a student to answer pre-determined questions before three examining professors.  (Pl.'s Aff., Dkt. No. 93, ¶ 124.)  Prior to taking the Qualifying Exam, plaintiff informed one of the examiners, Professor Hagerup, that he suffered from a medical condition that caused him to fatigue easily.  (Pl.'s Aff., Dkt. No. 93, ¶ 130.)  Professor Hagerup arranged a break schedule with the other examiners which gave plaintiff an automatic five minute rest period every 10 to 15 minutes.  (Pl.'s Aff., Dkt. No. 93, ¶ 131.) Under these conditions, plaintiff took and passed the Qualifying Exam in mid-April of 2002. (Pl.'s Aff., Dkt. No. 93, ¶ 128, ¶134.)

Although it is disputed who ended the relationship, Professor Myrabo stopped serving as plaintiff's thesis advisor in February 2003–less than a year after plaintiff successfully completed his Qualifying Exam.  Plaintiff alleges Professor Myrabo resigned. (Pl.'s Statement of Facts, Dkt. No. 94, ¶ 20.)  Defendant asserts that on or about February 25, 2003, a meeting was held between Professor Maniatty, the then-associate chair of graduate studies in the MANE Department, to determine how to proceed in light of the issues between plaintiff and Professor Myrabo.  During that meeting, defendant maintains that plaintiff decided he did not want Professor Myrabo to continue as his thesis advisor.  (Def.'s Statement of Facts, Dkt. No. 90, ¶ 36.)  In any event, Professor Jansen replaced Professor Myrabo as plaintiff's thesis advisor in February 2003.

As plaintiff's new thesis advisor, Professor Jansen was one of three examiners presiding over plaintiff's Candidacy Exam.  Accordingly, plaintiff met with Professor Jansen several days prior to taking the Candidacy Exam, as he did with Professor Hagerup before the Qualifying Exam, to discuss his medical condition and to make arrangements for periodic breaks so plaintiff could rest.  (Pl.'s Statement of Facts, Dkt. No. 94, ¶ 43.)  Defendant contends that Professor Jansen clearly indicated that "if plaintiff needed a break, he'd ask for it and he'd get it."  (Def.'s Statement of Facts, Dkt. No. 90, ¶ 45.)  However, plaintiff contends that it was unclear from the conversation "how many and how each break would be called for," and that Professor Jansen's demeanor put a "chill on the discussion which prevented [plaintiff] from going into the detail that [plaintiff] would have liked in discussing [his] medical needs during the Candidacy Exam.  (Pl.'s Statement of Facts, Dkt. No. 94, ¶ 45; Pl.'s Aff., Dkt. No. 93, P. 25, ¶ 167.)  Neither party disputes that plaintiff was told he would receive at least one break during the Candidacy Exam.

RPI administered plaintiff's Candidacy Exam in mid-to-late Spring 2003.  During the Candidacy Exam, plaintiff had one break approximately 45 minutes into the exam.  He never requested another break.  (McInerney Dep., Ex. A to Ginsberg Aff. at 77:2-9.)  Afterward, during the final round of questioning by Professor Kaminiski regarding radiation heat transfer and radiation modeling, plaintiff fatigued and began to feel the onset of symptoms which typically preceded his seizures.  These symptoms were exacerbated by the stress from the exam.  Plaintiff fatigued to the point where he found it difficult to speak and was unable to ask for a break.  Plaintiff struggled to answer Professor Kaminski's questions and ultimately failed the Candidacy Exam.

Defendant maintains that plaintiff's failure to answer Professor Kaminski's questions regarding the radiation heat transfer was the result of plaintiff's lack of expertise, and therefore, the decision to fail plaintiff was both warranted and entirely unrelated to his disability.  Although plaintiff does not dispute his failure to answer several questions adequately, he attributes such failure to defendant's refusal to provide sufficient rest breaks.

The day after the Candidacy Exam plaintiff met with Dr. Tichy, the MANE Department Chairman.  (Pl.'s Aff., Dkt. No. 93, ¶ 176.)  Plaintiff told Dr. Tichy that he was unable to answer Professor Kaminiski's questions during the Candidacy Exam because he was not given adequate rest, and he was fatigued as a result of his disability.  (Id.)  Plaintiff also explained that Professor Jansen failed to inform Professor Kaminski or the other examiners that plaintiff's inability to answer the questions was due to his disability.  (Id.)  Plaintiff asked Dr. Tichy to explain to Professor Kaminski that plaintiff's failure to answer her questions correctly was due to his disability rather than his lack of technical knowledge.  (Id.)  Dr. Tichy refused and told plaintiff that he should stop using his disability as an excuse.  (Id.)

The procedure a student must follow after failing a Candidacy Exam is not directly specified in MANE's Doctoral Degree Requirements.  However, according to Professor Maniatty, the then-associate chair of graduate studies in the MANE Department, when a student fails a Candidacy Exam, the examiners, through the candidate's thesis advisor, inform the student of the deficiencies in his exam performance and make recommendations to resolve such issues.  (Maniatty Dep., Ex. K to Ginsberg Aff. at 103:12-16.)  Depending on the nature of the deficiencies and the specific recommendations, a student may be required to retake the Candidacy Exam or meet with each examiner individually to get their approval.  (Id. at 105:3-15.)  Plaintiff was informed by Professor Jansen that if he met certain

conditions, including answering Professor Kaminiski's questions, he would be deemed to have passed the exam. (Jansen Dep., Ex. O to Ginsberg Aff. at 83:18-23.)  Plaintiff claims that he was never offered an opportunity to retake the examination a second time, (Pl.'s Aff., Dkt. No. 93, ¶ 230; Pl.'s Statement of Facts, Dkt. No. 94, ¶ 65.) whereas defendant maintains that plaintiff never sought to schedule a second opportunity to take the exam.  (Def.'s Statement of Facts, Dkt. No. 90, ¶ 65; Pl.'s Statement of Facts, Dkt. No. 94, ¶ 65.)

        In August 2003, plaintiff requested, and was granted, a leave of absence for the 2003-2004 academic year pursuant to a recommendation from Professor Maniatty. (McInerney Dep., Ex. A to Ginsberg Aff. at 162:13.)  Plaintiff also requested, and was granted, a leave of absence for the 2004-2005, 2005-2006, and 2006-2007 academic years.

        Although on leave throughout the 2003-2004 academic year, plaintiff continued to work on his thesis, and Professor Jansen continued to serve as plaintiff's thesis advisor. (Jansen Dep., Ex. O to Ginsberg Aff. at 30:17.)  During this time, plaintiff attempted to learn a computer code ("Code") remotely from his home with Professor Jansen's assistance.  (Pl.'s Aff., Dkt. No. 93, ¶ 179.)

        Plaintiff was unhappy with the assistance that Professor Jansen provided him in learning the Code and twice requested that he be provided a tutor, which plaintiff offered to pay at his own expense.  Professor Jansen responded that he did not "think a tutor [would] be necessary but [they] can cross that bridge when/if [they] come to it." (Ex. T to Ginsberg Aff.)  Professor Jansen also repeatedly directed plaintiff to online tutorials for help with the Code and insisted that such tutorials were more useful than a tutor.  (Jansen Dep., Ex. O to Ginsberg Aff. at 50:13-22.)  Plaintiff found these tutorials unhelpful and continued to contact Jansen both by phone and by email for further assistance.  Professor Jansen, while

responding to plaintiff's emails, did not answer or return many of plaintiff's phone calls.

When plaintiff finally did reach Professor Jansen by phone, he told plaintiff that he had no

time to help, which plaintiff interpreted to mean that Professor Jansen no longer wanted to

serve as his thesis advisor.  (McInerney Dep., Ex. A to Ginsberg Aff. at 359:3.)

Plaintiff claims that using the on-line tutorials was difficult because of his

concentration problems and his fear that the resulting mental and physical fatigue would put

him at a greater risk of a seizure.  (Pl.'s Aff., Dkt. No. 93-2, ¶ 188-216.)  Without much

additional assistance from Jansen or a tutor, plaintiff never successfully learned the Code. As

a result, plaintiff ended his student-relationship with Professor Jansen on or around July 15,

2004.

That summer, Plaintiff also met with Professor Kaminiski several times in an

attempt to resolve the issues with his performance during the Candidacy Exam.  (Pl.'s Aff.,

Dkt. No. 93, ¶ 202.)  Plaintiff claims that the thesis draft he sent to Professor Kaminski and

the subsequent discussion of the thesis draft during their first meeting satisfactorily answered

the professor's questions.  (Pl.'s Statement of Facts, Dkt. No. 94, ¶ 61-64.)  Plaintiff also

claims that any remaining questions were answered via email following their second meeting.

(Id.)  In any event, at no time was Plaintiff officially deemed to have passed the Candidacy

Exam.

Several years later, on or about July 17, 2007, plaintiff formally requested a

reactivation of his student status.  (McInerney Dep., Ex. A to Ginsberg Aff. at 257:16-23.)  In

August 2007, the Vice Provost and Dean of the Engineering Department, Lester A. Gerhardt,

and MANE Department Head, Timothy Wei, denied plaintiff's request due to his performance

during the Candidacy Exam, his failure to satisfy the follow-up requirements with Professor

Kaminski, and his lack of a thesis advisor. (Ex. W to Ginsberg Aff.) In order to return to active status, plaintiff was told he needed to propose a new research topic, select a new thesis advisor, assemble a potential doctoral thesis committee, and draft a new graduate plan of study. (Id.)

On October 10, 2007, Dean Gerhardt responded to an August 29, 2007 letter from plaintiff's attorney. (Ex. X to Ginsberg Aff.) Dean Gerhardt repeated the requirements to gain active status, including selecting a new thesis advisor. The letter also stated that "because there is no one else in the Department with expertise necessary to advise this project, [plaintiff] left himself no alternative but to begin the dissertation process anew." (Id.) Pursuant to RPI policy, a doctoral candidate's thesis advisor must be a full-time tenure-track member of the RPI Faculty. (Ex. Y to Ginsberg Aff. at 82.) To date, plaintiff has neither selected a new thesis advisor nor been granted active status at RPI.

## III. DISCUSSION

### A. Motion for Summary Judgment

Defendants move pursuant to Federal Rule of Civil Procedure 56 for summary judgment of all of plaintiff's claims. Summary judgment is warranted when the pleadings, depositions, answers to interrogatories, admissions, and affidavits reveal no genuine issue as to any material fact. Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986). All facts, inferences, and ambiguities must be viewed in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). Initially, the burden is on the moving party to demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2458 (1986). After the moving party has satisfied its

burden, the non-moving party must assert specific facts demonstrating there is a genuine

issue to be decided at trial. Fed. R. Civ. P. 56; Liberty Lobby, Inc., 450 U.S. at 250, 106 S.

Ct. at 2511.  The non-moving party "must do more than simply show that there is some

metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586,

106 S. Ct. at 1356.  There must be sufficient evidence upon which a reasonable fact finder

could return a verdict for the non-moving party. Liberty Lobby, Inc., 477 U.S. at 248-49, 106

S. Ct. at 2510; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356.

### B. Title III of the American with Disabilities Act and Section 504 of the Rehabilitation Act.

Title III of the ADA states that "[n]o individual shall be discriminated against on the

basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges,

advantages, or accommodations of any place of public accommodation by any person who

owns, leases, or operates a place of public accommodation."  42 U.S.C. §12182.  The ADA

defines a "public accommodation" as a private entity affecting commerce, including, inter

alia, "a nursery, elementary, secondary, undergraduate, or postgraduate private school, or

other place of education."  42 U.S.C. §12181(7)(j).  Finally, the ADA defines "discrimination"

to include, inter alia,  "a failure to make reasonable modifications in polices, practices, or

procedures, when such modifications are necessary to afford such goods, services, facilities,

privileges, advantages, or accommodations to individuals with disabilities, unless the entity

can demonstrate that making such modifications would fundamentally alter the nature of the

goods . . . ."  42 U.S.C. §12182(b)(2)(a)(ii).

Similarly, § 504 provides that "no otherwise qualified individual with a disability in

the United States shall, solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. §794. Under the Rehabilitation Act, the term "program or activity" is defined to include all of the operations of "a college, university or other post secondary institution, or a public system of higher education . . . any part of which is extended Federal financial assistance." 29 U.S.C. §794(b)(2)(A).

Title III of the ADA and § 504 provide similar protections for individuals with disabilities. Accordingly, the elements a claimant must establish to prevail on an action under either statute are the same. Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 85 (2d Cir. 2004). The circumstances which would require separate analysis are not present in this action and thus, plaintiff's claims under these statutes will be considered together.

To establish a prima facie case under either statute, plaintiff must demonstrate the following elements: "(1) that plaintiff is a qualified individual with a disability; (2) that the defendant is subject to one of the Acts; and (3) that [plaintiff] was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of his or her disability." Powell, 364 F.3d at 85. In light of the very broad statutory definition of discrimination, defendant's have a general obligation to provide "reasonable accommodations" to individuals with disabilities; and consequently, a covered entity's failure to provide such accommodations will be sufficient to satisfy the third element. See 42 U.S.C. §12182(b)(2)(a)(ii); Powell, 364 F.3d at 85. The question of whether a proposed accommodation is reasonable is fact-specific and must be evaluated on a case-by-case basis. Kennedy v. Dresser Rand Co., 193 F.3d 120, 121 (2d Cir. 1999).

## 1. __Failure to Provide Sufficient Rest Breaks__

Plaintiff's <u>First and Second Causes of Action</u> allege that defendant failed to provide sufficient rest breaks during his Doctoral Candidacy Exam in violation of Title III of the ADA and Section 504.  (Pl's. Am. Compl., Dkt. No. 55, ¶ 32.)  Plaintiff argues that an entity administering an exam is required by ADA regulations to select and administer an exam so as to best ensure that when administered to an individual with a disability, such exam accurately reflects the individuals aptitude.  28 C.F.R. §36.309(b)(1)(I).  Plaintiff further argues that to achieve this goal, an entity may be required to make modifications to the examination including, changes in the length of time permitted for completion and adaptation of the manner in which the examination is given.  28 C.F.R. §36.309(b)(2).  Defendant contends that arrangements made with Professor Jansen regarding rest breaks during the Candidacy Exam constituted a reasonable accommodation sufficient to satisfy the obligations imposed by Title III of the ADA and § 504.

It is undisputed that plaintiff's disability requires him to take frequent mental breaks, and that plaintiff had only one break during his Candidacy Exam.  (Pl's. Am. Compl., Dkt. No. 55, ¶ 15; Def's. Statement of Facts, Dkt. No. 90, ¶ 47.)  What is unclear, however, are the details of the conversation between Professor Jansen and plaintiff that occurred prior to the Candidacy Exam, in which the two discussed plaintiff's medical needs for the exam.  Defendant claims that Jansen "clearly indicated that if plaintiff needed a break, he'd ask for it and he'd get it."  Plaintiff responds that "[n]othing was clear about getting a break at the exam," and that it was "not clear how many and how each break would be called for."  (Pl.'s Statement of Material Facts, Dkt. No. 94, ¶ 45.)

The details of the conversation that occurred between plaintiff and Professor Jansen are critical to the determination of whether accommodations provided to plaintiff were reasonable and whether defendant ultimately discriminated against plaintiff.  Viewed in the light most favorable to plaintiff, it was at least unclear whether he could ask for breaks.  Therefore, there is an issue of fact as to whether Professor Jansen's comments precluded plaintiff from requesting or receiving frequent breaks during the exam.  If so, there is a reasonable basis to conclude that defendant failed to provide reasonable accommodations for the administration of plaintiff's Candidacy Exam.  Therefore, plaintiff's motion for summary judgment as to Causes of Action One and Two will be denied.

## 2. Failure to Inform Examiners of Plaintiff's Disability.

Plaintiff's Third Cause of Action alleges that defendant violated Title III of the ADA by failing to assist plaintiff in communicating to the examiners the problems plaintiff encountered during his Candidacy Exam. The parties agree plaintiff asked MANE Department Chairman, Professor Tichy, to explain to the examiners that plaintiff's inability to answer the questions satisfactorily was the result of plaintiff's disability.  (Pl.'s Aff., Dkt. No. 93, ¶ 176.)  It is also undisputed that Professor Tichy declined to discuss plaintiff's issues with the examiners.  (Id.)

Plaintiff asserts that defendant's refusal to speak with the examiners constitutes discrimination since discrimination is statutorily defined to include, inter alia, "the failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services . . . or otherwise treated differently because of the absence of auxiliary aids and services."  42 U.S.C. §12182(b)(2)(a)(iii).  Plaintiff further contends that defendant's refusal violated ADA regulations which require that an exam be "selected and

administered so as best to ensure that, when the exam is administered to an individual with a disability . . . the examination results accurately reflect the individual's aptitude . . . rather than the individual's impaired sensory, manual, or speaking skills" 28 CFR § 36.309(b)(1)(I). Defendant responds that plaintiff's request is no more than a personal preference, which is not protected under the ADA or Rehabilitation Act. See Hartnett v. Fielding Graduate Institute, 400 F.Supp.2d 570, 576 (S.D.N.Y., 2005), rev'd on other grounds, 198 F. App'x. 89 (2d Cir. 2006).

Taking all facts and inferences in favor of the plaintiff, there is an evidentiary basis to conclude that Professor Tichy's refusal to communicate with the examiners was an act of discrimination.  Under these particular facts, a reasonable fact-finder could determine that Professor Tichy's refusal to explain to the examiners the basis for the difficulties plaintiff encountered during the exam constituted a failure to take steps to ensure that plaintiff was not treated differently because of the absence of auxiliary services.  Moreover, defendant points to no binding authority in support of its position that plaintiff's request for Professor Tichy to explain his disability to the examiners was merely a personal preference.  Therefore, summary judgment on plaintiff's Third Cause of Action in favor of defendant is denied.

### 3. **Failure to Provide a Second Opportunity to Take the**

### **Doctoral Candidacy Exam**

In his Fourth and Fifth Causes of Action, plaintiff alleges that defendant's refusal to provide a second opportunity to take the Candidacy Exam constituted an act of discrimination in violation of Title III of the ADA and § 504.  However, plaintiff's memorandum of law in opposition to defendant's motion for summary judgment also alleges that defendant's failure to recognize post-exam efforts to satisfy Professor Kaminski's questions

violated the ADA and § 504. The allegations which state that defendant failed to recognize plaintiff's post-exam efforts were not properly pled in the amended complaint and thus, the consideration of this claim will be strictly limited to defendant's alleged failure to give plaintiff a second opportunity to take the Candidacy Exam.  Plaintiff did not include the "post-exam efforts" allegation expressly in the amended complaint, and none of the previous paragraphs which were incorporated into the claim by reference state with particularity any facts sufficient to put the defendant on notice of the alleged failure to recognize plaintiff's post-exam efforts. Plaintiff merely states that, following the Candidacy Exam, he planned to work with Professor Kaminski to address the questions he failed to answer during the exam and that he eventually resolved these issues during follow-up meetings with Professor Kaminski.  (Pl.'s Am. Compl., Dkt. No. 55, ¶ 18-19.)  Without more, defendant was not on notice of any claim for a failure to recognize post-exam efforts.  Thus, plaintiff's <u>Fourth and Fifth Causes of Action</u> are limited to what was expressly pled in the amended complaint; that is, that defendant failed to provide plaintiff a second opportunity to take the exam in violation of the ADA and § 504.

Plaintiff alleges that defendant never offered another opportunity to take the exam. Defendant argues that plaintiff never sought to reschedule the exam and that plaintiff was instead given the opportunity to meet with each examiner, including Professor Kaminski, to address the questions left unanswered during the exam.  However, the record to which defendant cites–a deposition from Professor Kaminski–does not support the allegation that plaintiff never sought to reschedule.  Professor Kaminski merely stated that she believed that plaintiff would be ready to take a second exam, but that she could not administer a second exam.  (Kaminski Dep., Ex. J to Ginsberg Aff. 28:1-4.)  In light of this gap in defendant's

argument, there is an issue of fact as to whether plaintiff sought a second exam, and

perhaps more importantly, whether RPI policy necessarily requires students to request a

second exam before one may be administered.  Accordingly, defendant's motion for

summary judgment as to the <u>Fourth and Fifth Causes of Action</u> will be denied.

### 4. <u>Understanding and Using the Fluids Code</u>.

Plaintiff's <u>Sixth Cause of Action</u> alleges that defendant failed to provide assistance

to plaintiff in understanding and using the computer fluids code in violation of Title III of the

ADA.

The facts with respect to this claim are also in dispute.  Plaintiff requested a tutor

from Professor Jansen in September 2003.  Professor Jansen replied to plaintiff, "I don't

think a tutor will be necessary but we can cross that bridge when/if we come to it," and

referred plaintiff to the online tutorials that Professor Jansen had successfully used to teach

other students.  After several more unsuccessful attempts to learn the Code using the

recommended online tutorials and video demonstrations, plaintiff again requested a tutor.

It is undisputed that plaintiff never received a tutor.  However, construed in the light

most favorable to plaintiff, there is an issue of fact as to whether Jansen was merely reluctant

to provide him with a tutor before he tried using online tutorials, or alternatively, whether

Jansen was entirely unwilling to provide plaintiff with a tutor due to his disability.  Thus,

summary judgment in favor of defendant on plaintiff's <u>Sixth Cause of Action</u> will be denied.

### 5. <u>Refusal to Assist in Finding a Thesis Advisor</u>

Plaintiff's <u>Seventh Cause of Action</u> alleges that defendant refused to assist plaintiff

in finding a Thesis Advisor in violation of Title III of the ADA.  Defendant responds that as a

result of plaintiff's voluntary termination of the advisor/student relationship with his two

previous thesis advisors, there were no RPI faculty that were qualified to serve as plaintiff's third advisor.

Pursuant to the Doctoral Degree Requirements of RPI's MANE Department, all doctoral candidates are required to, inter alia, choose a thesis advisor, select a plan of study, take an Oral Department Qualifying Exam, and take a Candidacy Exam. RPI also requires that the thesis advisor be a full-time tenure-track member of the RPI faculty. Plaintiff claims that his first thesis advisor, Professor Myrabo, resigned. Indeed, plaintiff introduces evidence, in the form of an email, in which Professor Myrabo stated that his resignation had been accepted by the MANE Graduate Department Chair. Defendant argues that plaintiff voluntarily terminated his relationship with Professor Myrabo. Accordingly, there is a disputed issue of fact as to whether defendant refused to provide an additional thesis advisor following Professor Myrabo's resignation, or alternatively, whether plaintiff refused defendant's attempts to do so. Moreover, even if plaintiff terminated his relationship with the other two advisors, there still exists a disputed issue of fact as to whether other faculty were qualified to serve as plaintiff's advisor, and whether defendant is under an affirmative obligation to seek new faculty in the event no full-time tenure-track faculty member is qualified. Thus, defendant's motion for summary judgment of plaintiff's Seventh Cause of Action will be denied.

### 6. Re-activation of Plaintiff's Student Status.

Plaintiff's Eighth and Ninth Causes of Action allege that defendant refused to allow plaintiff to change to an "active" status and resume his education at RPI in violation of Title III and Title V of the ADA and § 504.

It is undisputed that in July 2007, plaintiff requested a Change Status form to reactivate his student status.  In August 2007, the Vice Provost and Dean of the Engineering Department, Lester A. Gerhardt, and MANE Department Head, Timothy Wei, denied plaintiff's request reiterating that plaintiff had failed his Candidacy Exam, failed to satisfy the follow-up requirements with Professor Kaminski, and that he had no faculty member to serve as his thesis advisor.  Plaintiff was advised that to be granted active status, plaintiff would need to propose a new research topic, select a new thesis advisor, assemble a potential doctoral thesis committee, and draft a new graduate plan of study.  These conditions are consistent with RPI requirements that all doctoral candidates choose a thesis advisor, select a plan of study, pass an Oral Department Qualifying Exam, and pass a Candidacy Exam.

Defendant argues that plaintiff failed to comply with the conditions for reinstatement and therefore, defendant was under no obligation to change plaintiff's status to "active." Defendant maintains that there were no qualified thesis advisors on the RPI faculty to oversee his original thesis topic and subsequently, plaintiff needed to acquire a new thesis topic to ensure that a RPI faculty member was qualified to serve as his advisor.  According to defendant, there were no qualified RPI faculty members to serve as his advisor, and therefore, plaintiff cannot re-enroll as an active graduate student.

The resolution of this claim rests on the same disputed facts which preclude summary judgment of plaintiff's claim based upon the alleged refusal to help him find a thesis advisor.  In short, the parties disagree as to whether plaintiff terminated his relationship with Professor Myrabo.  In the event that Professor Mryabo resigned as plaintiff's thesis advisor, there is an evidentiary basis to conclude that defendant's refusal to change plaintiff's status to "active" on the grounds that there were no qualified advisors could be a potential violation

of the ADA.  Thus, defendant's motion for summary judgment cannot be granted on plaintiff's Eighth and Ninth Cause of Action.

### C.  Breach of Contract

Plaintiff's Tenth Cause of Action alleges that defendant breached its agreement with plaintiff in violation of state contract law by denying plaintiff service at RPI's Student Health Center.  "An action for breach of contract under New York law requires proof of: (1) a contract; (2) performance of contract by one party; (3) breach by the other party; and (4) damages."  First Investors Corp. v. Liberty Mutual Ins. Co., 152 F.3d. 162, 168 (2d Cir. 1998) (citing Rexnold Holdings, Inc. v. Biderman, 21 F.3d 522, 525 (2d Cir. 1994)).

There are no disputed facts as to whether the contract was breached.  Leslie Lawerence, the Medical Director of RPI's Student Health Center, confirmed in a sworn affidavit that it is the policy of the Student Health Center at RPI that students are not permitted to occupy beds solely for the purpose of resting or sleeping.  (Lawrence Aff., Dkt. No. 86-8, ¶ 5.)  For a student to be admitted to the Health Center the student must request medical attention or be admitted to see a provider.  (Id.)  Plaintiff responds, unpersuasively, that because defendant failed to produce a written copy of such a policy, there is a disputed issue of fact as to whether such policy exits.  However, plaintiff points to no evidence in support of this allegation, and "while facts must be resolved in favor of the party opposing motion for summary judgment, [i]t is not sufficient merely to assert a conclusion without supplying supporting arguments or facts in opposition to that motion."  R.G. Group, Inc. v. Horn & Hardat, Co., 751 F.2d 69 (2d Cir. 1984); See also L.R. 7.1(a)(3)("[T]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.")

Even construing all facts and inferences in favor of plaintiff, there is no evidence to suggest that the defendant had an obligation to allow plaintiff to lie down at the Health Center, and therefore, there are no disputed issues of material fact as to the alleged breach of contract.  Accordingly, defendant's motion for summary judgment on plaintiff's <u>Tenth Cause of Action</u> will be granted.

## IV. <u>CONCLUSION</u>

Defendant's motion for summary judgment on plaintiff's first nine claims, all of which involve the ADA or § 504, must be denied because there are genuine issues of material fact to be resolved at trail.  However, defendant's motion for summary judgment with respect to plaintiff's breach of contract claim must be granted because plaintiff provides no evidence to show that defendant had an obligation to allow him to rest at the Health Center. Finally, defendant's remaining arguments with respect to plaintiff's compliance with the Federal Rules of Civil Procedure and the Local Rules are dismissed as they are without merit.

Therefore, it is

ORDERED that

(1) defendant's motion for summary judgment of plaintiff's first nine causes of action are DENIED; and

   (2) defendant's motion for summary judgment of plaintiff's breach of contract claim

(Cause of Action Ten)  is GRANTED and that claim is DISMISSED.

   IT IS SO ORDERED.

_____
United States District Judge

Date:    March 24, 2010
         Utica, New York